COTTON BELT SAVINGS & TRUST COMPANY *v.* MORROW ET AL.

Opinion delivered June 16, 1913.

1. MECHANICS' LIENS—SUBCONTRACTOR—LEVEE DISTRICT.—A subcontractor on the construction of a levee for a levee district has no lien on the property of the district for labor or material furnished. (Page 550.)

2. LEVEE DISTRICTS—CONSTRUCTION—ASSIGNMENT OF RIGHT UNDER CONTRACT.—A levee district awarded a contract to M. to construct a levee, and M. procured plaintiff trust company to agree to finace the work and take the district's bonds; M. agreed to furnish all labor and materials, and gave a bond conditioned on his paying all liabilities for labor and materials. M. assigned his income arising under the contract with the district to plaintiff trust company, directing the district to deliver checks for work done and a monthly estimate to the trust company. *Held,* the assign-

ment from M. to the trust company entitled the latter only to
the net profits due M. and that subcontractors were entitled to
be paid by the district for their labor and material furnished, as
against the trust company under its assignment.   (Page 551.)

3.  LEVEE DISTRICT—SALE OF BONDS.—A levee district contracted with
a trust company to place its bonds with the company for sale;
the trust company with the consent of the district assigned its
interest and right to profits arising from the sale of the bonds
to one G., but the bonds were never sold.  *Held,* in an action
against the levee district by the assignee of the income of the
contractor, G. had no right to enforce his claim by an inter-
vention.   (Page 551.)

Appeal from Crawford Chancery Court; *J. V. Bour-
land,* Chancellor; affirmed.

*Rose, Hemingway, Cantrell & Loughborough,* for ap-
pellants.

*Coleman & Gantt,* for interpleader, James Gould.

*Mehaffy, Reid & Mehaffy* and *E. S. Matlock,* for the
levee district.

*Sam Dent Bell, Hill, Brizzolara & Fitzhugh* and *C. A.
Starbird,* for the interveners.

SMITH, J.   The General Assembly of 1909 passed an
act creating Levee District No. 1, of Crawford County,
Arkansas, which act described the boundaries of a dis-
trict to be protected from overflow, by the construction
of a levee therein provided for, and authorized the board
of directors to borrow money, and issue bonds in payment
of the work not to exceed $100,000.   Later, at the same
session of the General Assembly, this act was amended
in several respects, and authorized a total bond issue of
not exceeding $250,000.   The board of directors, named
in and provided for by the act, organized and advertised
for bids for the construction of this improvement, and
the contract was let to A. M. Morrow on the 7th day of
July, 1909.   Morrow commenced the actual construction
of the levee in the latter part of July, and a formal con-
tract was later entered into between him and the levee
district.

It appears that Morrow had neither the individual
means, nor the personal credit to perform this contract,

but he succeeded in enlisting the interest and support of the Pine Bluff Trust Company, a banking institution located at Pine Bluff, and of which one D. C. Bell was the executive officer. This trust company deposited with the officers of the levee district a certified check for $9,600, which accompanied Morrow's bid, and the levee officials were assured by Bell that Morrow would be amply able to comply with the contract, if it was let to him; that the trust company had the means to finance the enterprise, and could and would do so, by taking the bonds of the levee district, if no other disposition of them was made. Morrow entered into a written contract with the levee district under date of August 17, 1909, whereby he agreed to build the levee, and to construct certain concrete work, embraced in the engineer's specifications, and to accept in pay therefor the first mortgage bonds of said district at par, and it was provided in said contract that said bonds should be placed in trust in the hands of the Pine Bluff Trust Company, and by it sold at a price of not less than 90 per cent on the dollar, and the proceeds from such sale to be held by the trust company, and paid out by it to the builder on monthly estimates of the district engineer on signed orders of the directors of the district. It was further agreed that the proceeds of all bonds should be deposited with the said trust company, which should pay to the levee district 2 per cent per annum upon the monthly balances of the funds arising from the said sale until the same were expended, as per the terms and conditions of the contract, it being there expressed that the sum of $210,000 was but an approximation of the whole cost of the construction of the said levee under the builder's contract.

It was evidently contemplated by the parties in interest, that the levee district would soon be prepared to issue its bonds, and Morrow put a large force of men at work on the construction of the levee and entirely completed one part of the concrete work, which was embraced in the specifications, and received pay therefor. At the time Morrow received his estimate from the engineer for his

first month's work, the district had made no sale of the bonds, and Morrow did not have funds with which to pay his subcontractors, and various complications arose which interfered with the bond issue; and the bonds were never issued under the act which authorized the issuance of $250,000 of bonds, and under which the parties were then proceeding. Morrow continued the construction of the levee, and received from the engineer estimates for the work done both in September and in October, and borrowed from the trust company large sums of money, which he used to meet his obligations to his subcontractors. During all of this time the trust company and others were expecting the levee district to get in shape to issue its bonds.

On the 6th day of November, 1909, Morrow and the trust company entered into a written contract, which contained the following recitals, among others: That a verbal agreement had been entered into between Morrow and the district whereby the trust company had agreed to exert its influence to aid Morrow in procuring the contract for building the Crawford County Levee, and put up the certified check called for by the instructions to bidders issued by said levee district in advertising for bids, and had acted as agent for Morrow in selling the bonds which, under his contract with the levee district, should be paid to him for the construction of said levee, and had procured a contract of sale for the said $210,000 of bonds at 92 per cent of their face value; and that as the trust company had furnished Morrow certain sums of money, and might, at its option, advance other sums of money, it was agreed that for the purpose of securing the payment of any sums of money which were then, or might thereafter, be owed by the said Morrow to said trust company until the completion of the building of the said levee, the said Morrow set over, assigned and transferred to the trust company all his interest in the proceeds of said bonds, and authorized the trust company to collect and apply the same to the payment of such indebtedness, and it was stipulated that for such sums as

were advanced to said Morrow by the trust company, before final settlement of all the accounts between him and the trust company, that the company should have the right to apply the proceeds of said bonds to such indebtedness the same as if made before the completion of said levee work.

This contract further recited that the trust company should have, as its compensation, a commission of $1,050; and all interest which had accrued or might thereafter accrue on said bonds, before their delivery to the purchaser. This compensation was in lieu of the original agreement between Morrow and the trust company, wherein he had agreed to pay a commission of one per cent on the bonds and a certain percentage of the contract price, which the levee district was to pay for the work.

A firm of lawyers in Chicago, Ill., had been employed to pass upon and approve the bond issue, but they made a number of requirements which were never complied with, and it was afterward agreed that the firm of Rose, Hemingway, Cantrell & Loughborough of Little Rock should be employed to pass upon this bond issue, and to direct all the legal steps essential to their validity. This employment was suggested in a letter, written for the Pine Bluff Trust Company to the president of the levee district, in which the recommendation was contained that that firm also represent the levee district in certain litigation then pending, which involved the constitutionality of the act itself, and the validity of the assessments made under it. This firm had fixed its fee at $1,000, and Bell proposed to share its payment equally with the levee district, if that firm was given entire control of that litigation, and of the district's bond issue. This proposition was accepted, and that firm was employed and represented the district in said litigation. But for various reasons, these bonds were never issued.

The trust company was unable to handle these bonds, or to find a purchaser for them, and Judge James Gould was employed for that purpose. The contract therefor

was made on the 18th of August, 1909, at Pine Bluff, Ark., by which, Morrow and the trust company assigned and transferred to the said Gould all interest and profits which they had in the sale of the $210,000 of Crawford County levee bonds over and above the price of 92 per cent on the dollar and accrued interest; in other words, Gould agreed to pay to Morrow and the trust company 92 per cent and accrued interest for said bonds, and the rights which Gould seeks to enforce in this litigation grows out of this agreement. The levee district was advised of this contract and assented to it.

Morrow was compelled to shut down his construction of the work, which he did about the 1st of December, because the trust company declined to make him any further advances of money, and because he was unable to secure and sell the bonds of the levee district. The proof shows that Bell had made a number of visits to Van Buren in connection with this work, and ordered the work closed down, and directed the settlement, which was finally made, and out of which this litigation grows.

The Legislature of 1911 changed the boundaries of this levee district and excluded therefrom a considerable part of it, and authorized a bond issue of not exceeding $175,000, which bonds were sold, and out of the proceeds of this bond sale, the levee district has undertaken, both to complete the Morrow contract, and to discharge the obligations of that contract, in its partial performance. When the work under Morrow's contract was suspended, the levee district issued certificates of indebtedness to Morrow's subcontractors, and the material and supply furnishers in the sum of $47,277.25, and the engineers' estimates given Morrow for the work done by him amounted to $57,422. The court found that these certificates of indebtedness were so issued under the direction of Bell. Prior thereto, and on the 18th of September, 1909, Morrow had given to the Pine Bluff Trust Company an order to the levee district for all this income arising out of the contract to build the levee, and this order was presented to the president of the levee board and by him

endorsed "Accepted," and upon this order the Cotton Belt Savings and Trust Company, and the Pine Bluff Trust Company, which had been succeeded by the Cotton Belt Savings and Trust Company, brought this suit jointly to distribute the money in the treasury of the levee district due on the Morrow contract, claiming priority and attacking the payments made by the levee district to Morrow's subcontractors and material and supply furnishers.

There were a large number of interventions filed in this suit by some of the subcontractors, with whom Morrow did not settle, and gave orders on the levee district, and some material and supply furnishers who did not receive orders from Morrow to the levee board, and who were not paid by the levee district for that reason.

The trial court found the issues against the plaintiffs, and ordered the fund distributed, first, to the interveners, and the balance to the plaintiffs, and dismissed the intervention of James Gould for the want of equity, and the trust companies and Gould appeal from that decree.

The chancellor prepared a written opinion in which he made certain findings of fact, and, among others, that the agreement before referred to, dated September 18, 1909, between Morrow and the trust company, which was called an assignment of Morrow's right under the contract to receive money in payment of the work due thereunder, was an assignment of the net profits due Morrow by the levee district, and not the gross amount which was earned. The part of the contract which received this construction reads as follows: "For a valuable consideration, I have sold and assigned to the Pine Bluff Trust Company all of my income arising out of the construction contract I have with this board, * * * including retained percentage, etc.;" and this contract further authorized and directed the levee board to furnish to the Pine Bluff Trust Company, from month to month, estimates of the work done, when prepared by the engineer, and to deliver checks to the Pine Bluff Trust Company,

taking its receipt therefor.   The court also found the facts to be that Bell was clothed with the full authority to act for the trust company in all matters relating to this contract, and that while so acting, he directed the levee district to issue its interest-bearing certificates of indebtedness to the subcontractors and material furnishers. But, whether Bell had the express authority from the trust company to direct that this action be taken by the levee district or not, the fact is clearly established by the evidence that he did direct the issuance of these certificates, and that they were issued in obedience to his directions.   But we think the chancellor's construction of the contract is correct, and that it is supported by the action which the parties to it took under it.   Bell was thoroughly familiar with this transaction, and he acted both for himself and Morrow, from its inception down to the time of his death, which occurred before the trial of the cause below, and his deposition was never taken.

The contract between Morrow and the levee district for the construction of the levee contains the following section:

"And when all the work embraced in this contract has been completed agreeably to the specifications, and according to the directions and to the satisfaction and acceptance of the chief engineer, there shall be a final estimate made of said work, agreeably to the terms of this agreement, when the balance appearing due to the said party of the first part shall be paid to him in bonds as above upon his giving, under seal, a release to the said board of directors, from all claims or demands whatsoever growing in any manner out of this agreement."

The bond which Morrow was required to execute in the sum of $53,000, contained the covenant that Morrow should be responsible for, and pay all liability incurred, in the prosecution of the work for labor and material, and that his bond should be void only when that had been done.   The provisions quoted from the contract and bond were evidently inserted, not to protect the levee district from any claims of liens in favor of these subcontractors,

but this language was evidently employed for the purpose of protecting the subcontractors, who had no liens under the law. *Goyer* v. *Williamson*, 107 Ark. 189, 154 S. W. 525. It was known that Morrow was not personally able to pay the large sums of money which would necessarily become due to his subcontractors and material furnishers, and the action taken by the parties to this transaction sustain the interpretation of the court below given to the various contracts in evidence, that the trust company should receive for Morrow only the net profits derived by him from the performance of the contract. Morrow could only assign to the trust company what belonged to him and the officer acting for the trust company knew what these rights were, for this officer had represented to the officials of the levee board that Morrow would be able to meet his obligations, if the contract was awarded to him, and when this official closed down the work and declined to make further advances for the trust company, and there had been no sale of the bonds to provide a fund for the payment of these obligations, Bell authorized what must have been in the contemplation of the parties, when the contract was made, that Morrow's obligations be first paid. This view of the contract between Morrow and the levee district is strengthened by a consideration of another section of it, which provides that Morrow should furnish all the labor and material necessary to complete the levee, and that when completed according to the contract, he should give a release to the board of directors for all claims or demands whatsoever growing in any manner out of that agreement, and he should then receive final payment.

The stopping of the work on Bell's order was an end of the contract, so far as Morrow was concerned, and to be entitled to full pay for the work done, including the retained percentage of 15 per cent, which the levee district was authorized to withhold until a full compliance with the contract, required that Morrow should settle with these subcontractors and material men. And, as Bell was not willing to advance for the trust company any

more money, and as the bonds had not been sold, these settlements could be made only by the issuance of certificates of indebtedness. And certainly it was not in the contemplation of the parties, and is not fair that when this had been done, that the levee district should be compelled to pay these demands a second time, or to pay such part of them a second time, as would enable the trust company to collect all of its advances to Morrow, and enable Gould to collect his commission on the bond sale which he had negotiated. The chancellor dismissed the claim of Gould for his commission of 8 per cent upon this bond issue, or even that per cent upon the sum due Morrow from the levee district, and we think that finding was correct. These bonds were never sold nor issued, and the act which authorized their issuance was repealed, and if Gould has any remedy, it is not against this levee district, and can not be enforced in this proceeding.

The chancellor found from the evidence before him the sum due upon the various interventions, and no complaint is made here of the correctness of any of these findings, it being objected only that he decreed that they should have priority in payment, but as has been stated, we approve his action in that respect, and affirm his order.

The levee district filed a counterclaim against the trust company for one-half of the fee paid the firm of Rose, Hemingway, Cantrell & Loughborough, and the chancellor found that it should have judgment against the trust company therefor, and we think that finding is not against the preponderance of the evidence.

Upon the whole case, we think the chancellor's finding and decree is not contrary to the clear preponderance of the evidence, but that, on the contrary, equity has been done and the decree of the court below is accordingly affirmed.

Mr. Justice Kirby dissents, except as to the finding and judgment on the intervention of Gould.

The intervention of Gould will therefore be dismissed at his cost, and the intervener will pro rate in the distri-

bution of the sum due Morrow by the levee district as directed in the decree below, and any balance which remains after the demands of said interveners have been discharged will be paid to the appellant, Cotton Belt Savings & Trust Company, as successor to the Pine Bluff Trust Company.